UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JAMES ALLEN FLOYD,

      Plaintiff,

      v.

ADA COUNTY, et al.,

      Defendants.

Case No.  1:17-cv-00150-DCN

**MEMORANDUM DECISION AND ORDER**

## I.  OVERVIEW

Pending before the Court are: Plaintiff James Allen Floyd's Motion for Extension of Time (Dkt. 58); Defendants Ada County, Ada County Jail, Nurse Dean, Nurse Woodcook, Nurse Rankin, and Mr. Farwell's (collectively hereinafter "Defendants") Motion for Leave to File Overlength Brief (Dkt. 59); Defendants' Motion for Summary Judgment (Dkt. 60); Defendants' Motion to Seal (Dkt. 61); Floyd's Motion to file Amended Pleading (Dkt. 64); Floyd's Motion to Stay Summary Judgment (Dkt. 66); Floyd's Motion to Withdraw Motion for Extension of Time (Dkt. 67); Floyd's Motion to Appoint Counsel (Dkt. 68); and Floyd's Motion to file Overlength Statement of Disputed Facts (Dkt. 70).

The motions have been fully briefed and are ripe for decision. Having reviewed the record and briefs, the Court finds that the parties have adequately presented the facts and legal arguments. Accordingly, in the interest of avoiding further delay, and because the

Court finds that the decisional process would not be significantly aided by oral argument, the Court will decide the motions without a hearing. Dist. Idaho Loc. Civ. R. 7.1(D)(1)(b).

## II. FACTUAL BACKGROUND

### A. Procedural Background

On August 25, 2014, officers arrested Floyd and placed him in the Ada County Jail ("ACJ") located in Boise, Idaho. Floyd remained at the ACJ until he was transported to the Idaho Department of Corrections ("IDOC") on October 1, 2015. Floyd alleges he had a number of medical problems that Defendants failed to adequately address during his time at the ACJ.

Floyd filed this suit on April 7, 2017, against Defendants and others who have since been dismissed from the case. *See*, *infra* notes 4–5. On May 23, 2017, Defendants filed a Motion to Dismiss for Failure to State a Claim. A little over a week later, Floyd filed an Amended Complaint, rendering the First Motion to Dismiss moot. Floyd's Amended Complaint asserted six claims of relief, all but one of which alleged Defendants were deliberately indifferent to Floyd's medical needs in violation of the Eighth and Fourteenth Amendments.[1] Specifically, Floyd alleged Defendants were deliberately indifferent to his sleep apnea (Claim One); Hepatitis C (Claim Two); mental health (Claim Three); foot pain (Claim Five); and shoulder pain (Claim Six).

On June 16, 2017, Defendants filed a Motion to Dismiss Floyd's Amended

---

[1] Claim Four alleged that the County was deliberately indifferent to Floyd's need for outdoor recreation. The Court dismissed Claim Four with prejudice because the two-year statute of limitations barred the claim. Dkt. 27, at 17.

Complaint. The Court scheduled oral argument on the Motion for December 5, 2017. When Floyd failed to appear at oral argument,[2] Defense counsel agreed to submit the pending motions on the briefing. On December 21, 2017, the Court granted Defendants' Motion to Dismiss, but granted Floyd leave to amend Claims Three, Five, and Six.[3]

Floyd thereafter filed a Second Amended Complaint. Dkt. 29. Floyd's Second Amended Complaint reasserted his claims based on Defendants' alleged inadequate medical treatment of his mental health, foot pain, and shoulder injury. Defendants filed a third Motion to Dismiss. Defendants first asked the Court to dismiss the individual defendants against whom Floyd did not make any allegations. Floyd did not respond to this argument and the Court dismissed such defendants without further analysis.[4] Defendants also sought dismissal of Floyd's three remaining claims for failure to state a claim against any remaining individual defendant or government entity.

The Court granted the Motion in part and denied the Motion in part. The Court dismissed Claim Six—involving Defendants' alleged inadequate treatment of Floyd's shoulder injury—with prejudice because Floyd could not establish Defendants were deliberately indifferent to his shoulder injury.[5] As further discussed below, the Court

---

[2] Although the precise date of his release is not clear from the record, Floyd was no longer in custody at the time of the hearing on December 5, 2017.

[3] The Court dismissed Claims One, Two and Four with prejudice because such claims were time-barred by the applicable two-year statute of limitations. Dkt. 27, at 24.

[4] The Court dismissed the following individual defendants because Floyd failed to assert any claims against them: "Mr. Mowjee," "Mr. King," "Officer Rodante," "Mr. Carda," "Mr. Hine," "P.A. Wells," "Sgt. Rhoades," "Mr. Jensen," "Stephen Bartlett," and "Sheriff Raney."

[5] The Court also dismissed Dr. Clive—the physician who treated Floyd for his shoulder pain—with

allowed Floyd to proceed on two Eighth Amendment claims: Claim Three, alleging inadequate medical treatment of his mental health, and Claim Five, alleging failure to treat Floyd's foot pain and restricting his access to pain medication.

The Court thereafter ordered the parties to submit joint litigation and discovery plans by September 13, 2018. Defense counsel attempted to contact Floyd by phone and mail several times prior to the deadline, but notified the Court on September 13, 2018, that they had been unable to do so. After waiting several months for Floyd to respond, the Court ultimately adopted Defendants' proposed dates and entered a Scheduling Order on January 8, 2019.

On February 13, 2019, Floyd filed a motion asking the Court to set aside its Scheduling Order.[6] In his motion, Floyd alleged he needed relief from the Scheduling Order because he had been suffering from various health problems and was again incarcerated in the ACJ, and thus no longer had access to his legal materials.[7] The Court extended the remaining deadlines in its Scheduling Order by sixty days, but clarified this extension did not apply to "the long-expired deadline for joinder of parties or to amend pleadings[.]" Dkt. 55, at 5. The Court also noted that no further extensions would be granted.

---

prejudice.

[6] Floyd also filed his second Motion to Appoint Counsel on this date. Floyd filed his first Motion to Appoint Counsel on July 7, 2017. The Court denied both motions because Floyd did not establish that "exceptional circumstances" supported the requests. Dkt. 27, at 24 n. 4; Dkt. 55, at 6–7.

[7] Floyd was arrested again, and taken into ACJ custody, in January 2019.

MEMORANDUM DECISION AND ORDER - 4

Floyd thereafter filed another Motion for Extension of Time (Dkt. 58), but subsequently filed a Motion to Withdraw his Motion for Extension of Time (Dkt. 67). Defendants filed the instant motion for summary judgment on August 20, 2019. Dkt. 60. Floyd responded with a Motion to File an Amended Complaint (Dkt. 64), a Motion to Stay Summary Judgment (Dkt. 66), and a third Motion to Appoint Counsel (Dkt. 68). The Motions are now all ripe for review.

**B. Factual Background**

*1. Claim Three: Mental Health Treatment*

In Claim Three, Floyd alleges that individual defendants Nurse Dean, Nurse Woodcook, and "Jane Doe 2," as well as municipal defendants Ada County and the ACJ, provided him with inadequate mental health care. According to Floyd, he was placed in a medical unit upon his arrival at the ACJ because he had suffered two seizures shortly before being transported there. Floyd was released from the medical unit after a few days. However, when a high bail was set at his video arraignment, Floyd attempted suicide by repeatedly running his head into a brick wall. Floyd was placed on suicide watch in the medical unit, where he wore a "turtle suit" for three days.[8] Dkt. 29, at 3.

On September 9, 2014, Floyd alleges he had a jail health assessment with Jane Doe 2, during which Floyd alleges he informed her that he suffered from depression, anxiety, and bipolar disorder, and that he had been taking "Depakote and Seroquel 300 mg for over two years" to treat these conditions. *Id*. Floyd alleges neither Jane Doe 2, nor any other

---

[8] Floyd does not explain what a "turtle suit" is.

ACJ employee, confirmed his prescriptions by obtaining Floyd's medical records, or otherwise supplied Floyd with his prescribed medication during his stay at the ACJ.

On November 17, 2014, Floyd submitted a health request informing the medical staff that he was experiencing symptoms of depression and anxiety because he was "being locked down" for so many hours each day. *Id*. On November 21, 2014, Floyd was seen by Physician Assistant Eric Wells. However, Floyd alleges P.A. Wells only treated him for sleep apnea, and did not address his mental health complaints, Floyd submitted a grievance on December 12, 2014, indicating that he had not seen anyone for his depression or anxiety.

Nurse Dean[9] responded to the grievance on December 15, 2014, by stating, "you were scheduled to be seen on 11/21 you were seen on 11/21. All of these issues could have been addressed at that time." *Id*. Nevertheless, Nurse Dean informed Floyd that he was scheduled to meet with a social worker. Floyd "filed an appeal because it had been almost thirty days" since he had requested mental health care. *Id*.

On December 16, 2014, Nurse Woodcook[10] responded to Floyd's grievance appeal and told him again that "he was scheduled to see a social worker." *Id*. Despite this assurance, Floyd claims he "was never scheduled to see a social worker," and that Nurses Dean and Woodcook only told him he was "to pacify [him] until he was released from the Ada county jail." *Id*. at 4. Floyd also alleges Nurse Dean treated him as a "nuisance" and

---

[9] "Nurse Dean" refers to Lanae Dean, a Registered Nurse on the staff of the ACJ Health Services. Dkt. 60-5, ¶ 1.

[10] Floyd originally identified Nurse Woodcook as "Mr. Woodcook." Upon review of the record on summary judgment, it appears all references to "Mr. Woodcook" instead refer to Ashley Rino fka Ashley Woodcook (hereinafter "Nurse Woodcook"). Dkt. 60-8, ¶¶ 1-2, 8-10, 14.

falsely told him he was scheduled to see a social worker to appease him. *Id*.

Floyd claims Defendants' failure to treat his mental health problems caused him to "live[] inside a mental prison" for the duration of his stay at the ACJ." *Id*. Floyd also alleges the failure to treat his mental health conditions was "based upon a custom and policy of the Ada County Jail, and or the private medical provider to understaff mental health providers in the jail to deal with the amount of mentally ill inmates in order to save money [b]ecause they believe most inmates will be released soon or transferred out." *Id*. The Court allowed Floyd to proceed with Claim Three as a 42 U.S.C. § 1983 claim against individual Defendants Nurse Dean, Nurse Woodcook, and "Jane Doe 2," and as a *Monell* claim against Ada County and the ACJ.[11]

On summary judgment, Defendants paint a different picture of Floyd's mental health treatment during his stay at the ACJ. Defendants first note Floyd underwent a screening which included a mental health screening and evaluation at the time of his booking into the ACJ. During that screening, Floyd answered "no" when asked whether he took any prescription medication. Dkt. 62-5, Ex. D, at 37. Floyd was also asked: (1) whether he had been treated for mental health issues in the past; (2) whether he had ever been in a hospital for emotional or mental health problems; (3) whether he had ever attempted suicide; (4) whether he had ever been in a hospital for emotional or mental health problems; (5) whether he was contemplating suicide or having thoughts of hurting himself; (6) whether there was any additional information regarding past or current health

---

[11] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

conditions that Heath Services needed to be aware of; and (7) whether he needed to be seen in Health Services prior to general housing. *Id*. at 40. Floyd answered "no" to each of these questions. *Id*. Floyd did not report to anyone that he suffered from depression, anxiety, and bipolar disorder, or that he had been taking Depakote and Seroquel. *Id*. On summary judgment, Floyd implies he did not identify his mental health issues or prescribed medication during booking because he was recovering from his seizures and was still lightheaded. Dkt. 71, at 4.

After booking, Floyd was taken to the Health Service Unit (HSU) to be monitored for alcohol detox. The following morning, Floyd was seen by Nurse Walker. Dkt. 62-5, Ex. C, at 10. Floyd reported that he was feeling good and had no complaints. *Id*. Floyd was seen a second time on August 26, 2014, by Dr. Clive. Floyd again reported he was feeling well and Dr. Clive cleared him for housing in the general population. *Id*. Floyd does not refute that he did not tell Nurse Walker or Dr. Clive that he suffered from depression, anxiety, or bipolar disorder, or that he had been taking Depakote and Seroquel.

The afternoon of August 26, 2014, after returning from his video arraignment, Floyd began demanding to be sedated and ramming his head into the window of his cell. *Id*. at 11. Floyd was placed on suicide watch and a social worker was called to come and talk to him. Lee Penchansky, Licensed Clinical Social Worker (LCSW), met with Floyd and observed Floyd was agitated. *Id*. at 29. Floyd also reported suicidal ideation and thoughts of self-harm to Penchansky. *Id*. Penchansky saw Floyd again the next day and noted Floyd was irritable but had agreed not to hurt himself. *Id*. Floyd was moved to lower safety precautions. *Id*.

MEMORANDUM DECISION AND ORDER - 8

On August 28, 2014, Floyd was seen by another social worker, Shanna Pickren, LCSW, who reported Floyd was upbeat and positive. *Id*. Floyd stated he was just angry when he came into jail, and "adamantly denie[d]" suicidal ideation. *Id*. at 30. Floyd was cleared from suicide watch and discharged from the HSU. Floyd does not refute that he did not report to Penchansky or Pickren that he suffered from depression, anxiety, and bipolar disorder, nor that he had been taking Depakote and Seroquel.

On September 2, 2014, Floyd underwent a health assessment interview with Nurse Twohig. Floyd again denied taking any prescription medications. Dkt. 62-5, Ex. D, at 33. However, Floyd stated he was receiving mental health services at an unidentified clinic on River St., and that he had attempted suicide "years back" by overdosing on pills. *Id*. Despite such statements, Floyd denied he was contemplating suicide at the time, and Nurse Twohig concluded Floyd did not manifest signs or symptoms of a psychiatric disorder. *Id*. In his proposed Third Amended Complaint, Floyd seeks to identify "Jane Doe 2" as Nurse Twohig.[12]

Floyd was next seen in the HSU on September 8, 2014, with complaints of another potential seizure, sleep apnea, and anxiety due to having court the following day. Dkt. 62-5, Ex. C, at 11. Floyd was assessed and placed on bed rest in the HSU for two hours. *Id*. Nurse Russell later evaluated Floyd, and Floyd stated he was feeling much better. *Id*. Nurse

---

[12] In his Second Amended Complaint, Floyd alleged that he advised Jane Doe 2 that he suffered from depression, anxiety, bipolar disorder and that he had been taking Depakote and Seroquel on September 9, 2014—not September 2, 2014. There are no treatment records to suggest Floyd saw Nurse Twohig (or any other ACJ treatment provider) on September 9, 2014, nor any evidence that he advised Nurse Twohig—on any date—that he suffered from depression, anxiety, bipolar disorder, or that he was prescribed Depakote and Seroquel.

Russell discussed non-medical interventions to address Floyd's anxiety, and Floyd was discharged from the HSU. *Id*. at 12. Floyd was also seen in the HSU on September 10 and 11, 2014, for complaints of right abdominal pain. *Id*. During his visits on September 8, 10, and 11, Floyd did not report to Nurse Russell or any other provider that he suffered from depression, anxiety, bipolar disorder, or that he had been taking Depakote and Seroquel. *Id*. at 11–12.

On November 17, 2014, Floyd submitted a medical request with a variety of complaints, including sleep apnea, fatigue, Hepatitis C, and "my depression seems to be increasing along with my anxiety." Dkt. 62, Ex. B, at 2. As mentioned, Floyd was seen by P.A. Wells on November 21, 2014, who noted, "patient believes that he has sleep apnea. States that he is told by his cellmates that he stops breathing at night, he has daytime somnolence and feels poorly. Reports body aches and feeling sad[13] because he is not sleeping soundly." Dkt. 62-5, Ex. C, at 13. P.A. Wells diagnosed Floyd with daytime somnolence and ordered a sleep study, which occurred the following night. *Id*. Floyd followed up with P.A. Wells on November 26, 2014, to discuss the results of the sleep study. Despite being seen by P.A. Wells on November 21 and November 26, Floyd submitted a grievance on December 12, 2014, indicating that he had not seen anyone for his depression or anxiety. Dkt. 62-2, Ex. A.

Nurse Dean responded to Floyd's grievance on December 14, 2014, reminding

---

[13] Floyd responds that he reported he was feeling bad—not sad—because he was not sleeping well. Floyd argues this purported inaccuracy in P.A. Wells' treatment notes illustrates his November 21, 2014, visit was only to evaluate his sleep apnea and did not address his complaints of depression and anxiety. Dkt. 71, at 11. The dispute is immaterial because P.A. Wells is no longer a defendant in this action. Dkt. 36, at 17.

Floyd that he was seen by P.A. Wells on November 21, 2014, and that all of his issues could have been addressed at that time. *Id*. Nevertheless, Nurse Dean informed Floyd that he had been scheduled to meet with a social worker to discuss his depression and anxiety. *Id*. Floyd appealed Dean's response. On December 16, 2014, Nurse Woodcook answered the appeal by informing Floyd again that he was scheduled to see a social worker. *Id*.

Although Floyd claims he never saw a social worker, the records suggest Floyd saw Laura Senderowicz, LCSW, on December 16, 2014. Dkt. 62-2, Ex. A, at 4. The December 16, 2014, treatment notes are the only record between August 2014 and September 2015 that show Floyd advised an ACJ health provider (Senderowicz) that he had a history of taking Depakote and Seroquel for bipolar disorder. *Compare* Dkt. 62-2, Ex. A, at 4 *with* Dkt. 62-5, Ex. C, at 9–20, 29–30. Senderowicz's December 16, 2014, treatment notes state Floyd informed her he was treated with Depakote and Seroquel through Access Behavioral Health. Dkt. 62-2, Ex. A, at 4. Senderowicz assessed Floyd with polysubstance abuse disorder and bipolar disorder "per pt report." *Id*. Senderowicz's treatment notes state: "Plan is to obtain pt's [mental health] records before considering referral for [mental health treatment]." *Id*. However, when Senderowicz followed up with Access Behavioral Health, Access Behavioral Health responded that it did not have any records for Floyd because he had never been treated there. *Id*.

Despite being seen nineteen additional times in the HSU after December 16, 2014, Floyd never again requested treatment for his mental health while incarcerated in the ACJ. Dkt. 62-5, Ex. C, at 14–20.

MEMORANDUM DECISION AND ORDER - 11

2. *Claim Five: Foot Pain*

In Claim Five, Floyd alleges he experienced severe foot pain while at the ACJ and that Defendants failed to examine, diagnose, or treat it. Specifically, Floyd claims that he developed foot pain in March of 2015 that greatly hindered his ability to walk. On April 10, 2015, Floyd submitted a health request stating: "My feet are so sore from wearing these cheap shoes they hurt to walk." Dkt. 62, Ex. D. On April 11, 2015, a staff member, "unknown Jane Doe 3," denied Floyd's request for new shoes, explaining the medical department did not provide shoes. *Id*.

On April 12, 2015, Floyd resubmitted his request for shoes. An unidentified staff member again denied the request, stating, "inmate worker shoes are available off commissary, per protocol you do not qualify for special shoes." Dkt. 62, Ex. E. On April 15, 2015, Floyd filed a formal grievance in which he complained that he could not purchase shoes himself because he was indigent, and that the pain was "affect[ing] [his] ability to walk." Dkt. 62-5, Ex. B. Floyd also noted that he would like to be seen for evaluation for a medical diagnosis, stating "[n]o one looked at me or examined me to make a medical diagnosis," and, "[c]onsidering how its causing me pain and affecting my ability to walk daily would indicate something needs to be done." *Id*.

Nurse Woodcook responded to the grievance on April 15, 2015, by advising Floyd that: (1) shoes were available for purchase on commissary; (2) the "medical department does not supply and/or prescribe orthotic shoes for inmates" (3) Floyd was already taking 600 milligrams of ibuprofen each day to help him manage his pain; (4) Floyd could have orthotic shoes prescribed by a community doctor brought to the jail; and (5) Floyd could

request an appointment if he wished to discuss pain management. *Id*. Rather than scheduling an appointment, Floyd appealed Nurse Woodcook's denial of his grievance.

Health Services Administrator Kate Pape[14] denied Floyd's appeal, but stated, "I will schedule you to see a medical provider to ensure that there is no other issue[] affecting your feet." *Id*. Defendants allege Floyd did not follow through with requesting an appointment, and also did not complain of foot pain at any of his subsequent health appointments for other matters. Dkt. 60-2, at 8. Defendants note Floyd was seen for chest pain nine days after Pape's denial of his appeal but made no mention of his foot pain during that visit. *Id*. (citing Dkt. 62-5, Ex. C, at 14). Floyd counters that Pape did not schedule him for an appointment, despite her clear statement that she would do so. Dkt. 71, at 15.

### 3. *Claim Five: Pain Medication*

On February 19, 2015, P.A. Wells prescribed Floyd prescription-strength ibuprofen for joint and back pain.[15] Dkt. 62-1, Ex. A. The prescription was for "600 mg BID prn," which means Floyd could take one 600 mg tablet of ibuprofen two times per day as needed.

---

[14] Floyd originally identified Nurse Rankin as "Mr. Rankin." On summary judgment, it appears all references to "Rankin" refer to Nurse Shauna Rankin. Dkt. 60-7, ¶¶ 1-5. Further, although Nurse Rankin's name appears at the bottom of page one Floyd's April 15, 2015 grievance, Defendant Health Services Administrator Kate Pape's name appears on page 2 of the grievance. Dkt. 62-5, Ex. B. Nurse Rankin filed a declaration stating Pape was responsible for reviewing and denying Floyd's April 15, 2015 grievance, as appeals are responded to by supervisors rather than nursing staff. Dkt. 60-7, ¶¶ 2–4. It appears Floyd's allegations regarding Nurse Rankin instead refer to actions taken by Pape.

[15] Floyd included his allegations regarding inadequate pain medication as part of Claim Five for inadequate treatment of his foot condition. In its prior Orders on Defendants' two Motions to Dismiss, the Court accordingly assumed the pain medication was prescribed for Floyd's foot pain, and that the allegations regarding pain medication were ancillary to Floyd's claim of inadequate treatment of his foot pain. Now that the medical records are before the Court, it appears that Floyd was prescribed pain medication for an entirely separate medical condition—back and join pain—unrelated to his foot issue. However, Floyd does allege that his prescription ibuprofen was insufficient to treat his foot pain. Dkt. 29, at 6.

Dkt. 60-4, ¶ 2.

On June 3, 2015, Floyd filed a grievance concerning his access to pain medication. According to Floyd, his ibuprofen was supposed to be "keep on person" (KOP) medication, so that he could take it whenever he needed it. Dkt. 60-9, Ex. A. In his grievance, Floyd complained that because of the ACJ's policy regarding KOP medications—which required inmates to keep prescription medication in storage lockers they only had access to at limited times during the day—he did not always have access to ibuprofen, and sometimes went long stretches of time without it. Defendant Sean Farwell responded to Floyd's grievance by explaining that there was a risk that inmates may sell or trade medication, so Floyd could not have access to his ibuprofen at all times. *Id*.

Floyd alleges Farwell's justification for the KOP policy was invalid because non-indigent inmates could purchase ibuprofen "off-commissary," had access to it at all times, and could thus sell or trade it. Dkt. 29, at 7. Floyd also argues he could not take his ibuprofen "as needed," as prescribed, because he often had pain at night or other times when he did not have access to his storage locker. Dkt. 71, at 16–17.

### III.  ANALYSIS

Because there are nine pending motions with different applicable legal standards, the Court sets forth the appropriate legal standard (where necessary) with respect to each motion. As it requires the most extensive analysis, the Court addresses Defendants' Motion for Summary Judgment last.

### A.  Motion for Extension of Time (Dkt. 58) and Motion to Withdraw (Dkt. 67)

Floyd filed a Motion for Extension of Time on August 16, 2019, claiming he was

again in the ACJ's custody and that he needed additional time because his legal materials had been confiscated. Floyd later filed a Motion to Withdraw his Request for an Extension of Time on September 3, 2019, stating he had been able to organize his legal materials with the help of another. Floyd's Motion for Extension of Time (Dkt. 55) is accordingly **MOOT** and therefore **DENIED**, and the Motion to Withdraw (Dkt. 67) is **GRANTED.**

## B. Motion for Leave to File Overlength Brief (Dkt. 59) and Motion to File Overlength Disputed Facts (Dkt. 70)

Due to the number of medical, factual, and legal issues involved in this case, Defendants requested leave to file five pages in excess of the twenty-page limit under Local Civil Rule 7.1(a)(2) with their summary judgment motion. Floyd similarly requested leave to file an overlength statement of disputed facts. Good cause appearing, the Court **GRANTS** the parties' requests.

## C. Motion to Seal (Dkt. 61)

Defendants seek an order sealing evidence containing Floyd's medical and health information, submitted with various declarations in support of their Motion for Summary Judgment. Floyd does not object to the request.

### 1. Legal Standard

Courts recognize a general right to inspect and copy public records and documents, including judicial records and documents. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (citation omitted). Documents that have been traditionally kept secret, including grand jury transcripts and warrant materials in the midst of a pre-indictment investigation, come within an exception to the general right of public access.

*Id*. Otherwise, "a strong presumption in favor of access is the starting point." *Id*. (citing *Foltz v. State Farm Mut. Auto Ins. Co*., 331 F.3d 1122, 1135 (9th Cir. 2003)).

A party seeking to seal judicial records must show that "compelling reasons supported by specific factual findings . . . outweigh the general history of access and the public policies favoring disclosure[.]" *Id*. at 1178–79. The trial court must weigh relevant factors including, "the public interest in understanding the judicial process and whether disclosure of the material could result in improper use of the material for scandalous or libelous purposes or infringement upon trade secrets." *Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 679 n. 6 (9th Cir. 2010) (internal quotation marks and citation omitted). While the decision to grant or deny a motion to seal is within the trial court's discretion, the court must articulate its reasoning in deciding a motion to seal. *Id*. at 679.

### 2. Analysis

The Court recognizes the need to protect medical privacy has qualified as a "compelling reason," for sealing records in connection with a dispositive motion. *See, e.g., Wesberg v. Takeda Pharm. U.S.A., Inc*., 2018 WL 625248, at *3 (C.D. Cal. 2018); *San Ramon Reg'l Med. Ctr., Inc. v. Principal Life Ins. Co*., 2011 WL 89931, at *1 n. 1 (N.D. Cal. 2011); *Abbey v. Hawaii Emp'r Mut. Ins. Co*., 2010 WL 4715793, at * 1–2 (D. Haw. 2010); *Wilkins v. Ahern*, 2010 WL 3755654, at *4 (N.D. Cal. 2010); *Lombardi v. Tri West Healthcare All. Corp*., 2009 WL 1212170, at *1 (D. Ariz. 2009). Here, all of the records Defendants seek to seal contain Floyd's sensitive health information, including his health requests, health grievance forms, medical records, as well as a physician's review of Floyd's medical and mental health records.

MEMORANDUM DECISION AND ORDER - 16

The balance between the need for the public's access to information about Floyd's medical history, treatment, and condition, against the need to maintain the confidentiality of Floyd's medical records, weighs in favor of sealing these exhibits. The Court accordingly **GRANTS** Defendants' Motion to Seal (Dkt. 61), and seals Exhibits B,C, D and E to the Declaration of Kate Pape (Dkt. 62), Exhibit A to the Declaration of P.A. Eric Wells (Dkt. 62-1), Exhibits A and B to the Declaration of Nurse Lanae Dean (Dkt. 62-2), Exhibit A to the Declaration of Dr. Jeffrey Keller (Dkt. 62-3), Exhibit A to the Declaration of Nurse Shauna Rankin (Dkt. 62-4), and Exhibits A, B, C, and D to the Declaration of Nurse Ashley Woodcook (Dkt. 62-5).

### D. Motion to File Amended Pleading (Dkt. 64)

Floyd seeks to amend his Second Amended Complaint to identify "Jane Doe 2" and to file, "an additional issue stemming from the same facts under the relations Back Doctrine FRCP 15(c)." Dkt. 64, at 1. In his proposed Third Amended Complaint, Floyd identifies "Jane Doe 2" as Nurse Twohig, states "Jane Doe 3" is still unknown to him, and attempts to identify Laura Senderowicz, LCSW as "Jane Doe 4." Dkt. 65, at 4, 8. Floyd also seeks to add a claim against Senderowicz for allegedly retaliating against him by not referring him for mental health treatment because he had filed three prior grievances. *Id*. at 5.

### 1. Legal Standard

When a plaintiff files a motion to amend, Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave when justice so requires." Yet, even under this liberal standard, leave to amend "is not to be granted automatically." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990). The court "may exercise its

discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (alterations in original).

Further, where, as here, a party moves for leave to amend after the deadline for amendment has lapsed, a party cannot "appeal to the liberal amendment procedures afforded by Rule 15; [t]he tardy motion [must] satisfy the *more stringent* good cause showing required under Rule 16." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 952 (9th Cir. 2006) (internal citation and quotation marks omitted) (emphasis in original); *see also* Fed. R. Civ. Proc. 16(b)(4) (the contents of a scheduling order "may be modified only for good cause and with the judge's consent."). "The district court is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order . . . will not be disturbed unless they evidence a clear abuse of discretion." *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 369 (9th Cir. 1985).

The Court's Scheduling Order provided Amended Pleadings were to be filed on or before October 20, 2018, and specifically noted that this deadline would only be extended "for good cause shown." Dkt. 44, at 2. Good cause is "an inquiry that focuses on the reasonable diligence of the moving party." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1174 n. 6 (9th Cir. 2007). "[T]he focus of the Rule 16(b) inquiry is upon the moving party's reasons for seeking modification." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

## 2. Analysis

Defendants suggest Floyd should be denied leave to amend because the new claim does not relate back to the original Complaint, because Floyd has shown a pattern of delay and failure to prosecute his case, because the proposed Third Amended Complaint adds entirely new allegations against Senderowicz, so she is not simply taking the place of "Jane Doe 4" after discovery, and because they would be highly prejudiced if Floyd were granted leave to amend at this late stage of the proceedings.

To demonstrate diligence under Rule 16's "good cause" standard, the movant may be required to show the following: (1) that he was diligent in assisting the Court in creating a workable Rule 16 order; (2) that his noncompliance with a Rule 16 deadline occurred, notwithstanding diligent efforts to comply, because of the development of matters which could not have been reasonably foreseen or anticipated at the time of the Rule 16 scheduling conference; and (3) that he was diligent in seeking amendment of the Rule 16 order, once it became apparent that he could not comply with the order. *Chao v. Westside Drywall, Inc.*, 709 F. Supp. 2d 1037, 1072–73 (D. Or. 2010) (quoting *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 608 (E.D. Cal. 1999)). Floyd fails on all three counts.

On July 20, 2018, after ruling on Defendants' Third Motion to Dismiss, the Court directed the parties to file a joint litigation and discovery plans by September 13, 2018. Although they attempted to contact Floyd to establish joint litigation and discovery plans on multiple occasions, Defendants notified the Court that Floyd failed to ever respond. The Court and defense counsel waited months for Floyd to weigh in on dates for the Court's Scheduling Order. When he did not, Defendants ultimately filed their own litigation and

discovery plans on December 18, 2018, noting that neither had been stipulated to by Floyd. On January 8, 2019, the Court entered its Scheduling Order adopting Defendants' proposed dates. Dkt. 44. Rather than assisting the Court in creating a workable Rule 16 order, Floyd did not respond to Defendants' attempts to contact him, ignored the Court's deadline for submitting his own proposed litigation and discovery plans, and did not contact the Court at all until five months after the September 13, 2018, deadline for submitting proposed deadlines had passed.

Nor has Floyd shown that his noncompliance with the Scheduling Order occurred, notwithstanding diligent efforts to comply, because of the development of matters which could not have been reasonably foreseen or anticipated at the time of the Rule 16 scheduling conference. Floyd suggests he should be granted leave to amend because he did not know Senderowicz's name or that she had purportedly denied him mental health treatment in retaliation for filing grievances, until such facts "came to light during discovery." Dkt. 73, at 2. However, the deadline for fact discovery—after the Court extended this deadline by sixty days at Floyd's behest—was July 21, 2019. Floyd did not file his Motion to Amend until August 23, 2019. Floyd does not identify when he first received discovery regarding Senderowicz. Floyd also does not offer any justification, let alone "good cause," for waiting an additional month after discovery closed all together before seeking amendment. Floyd cannot be found to have made diligent efforts to comply with the Scheduling Order in light of such omissions. *Integra Lifesciences I, Ltd. v. Merk KGaA*, 190 F.R.D. 556, 560 (S.D. Cal. 1999) (the failure to diligently act upon information obtained from an opposing party during discovery does not constitute "good cause" under

Rule 16); *Tschantz v. McCann*, 160 F.R.D. 568, 572 (N.D. Ind. 1995) (failure to pay attention to discovery received does not constitute good cause).

Finally, Floyd was not diligent in seeking to amend the Scheduling Order. On February 13, 2019, Floyd asked the Court to "set aside the scheduling order," based on various health problems and his recent return to the ACJ. Dkt. 48, at 1. Floyd did not identify any specific relief he desired, and did not ask the Court to extend deadlines, such as that for amending the pleadings, which had already passed. Although Floyd did not provide any documentation to support his medical claims, and also did not offer any explanation for his complete failure to respond in any way to either opposing counsel or to the Court for months, the Court extended the remaining deadlines in the Scheduling Order by sixty days. However, the Court specifically stated this extension "**will not** apply [to] the long-expired deadline for joinder of parties or to amend pleadings[.]" Dkt. 55, at 5 (emphasis in original).

Notwithstanding this ruling, once Floyd recognized that amendment might be required due to information obtained through discovery, it was his responsibility to timely request an extension of the amendment deadline. His failure to do so until after discovery had closed and after Defendants' Motion for Summary Judgment had been filed supports denying amendment. *Chao*, 709 F. Supp. 2d at 1074; *see also Canal Properties, LLC v. Alliant Tax Credit V, Inc.*, 220 Fed. Appx. 699, 700–01 (9th Cir. 2007) (affirming district court's denial of motion to amend, where, among other things, the motion was filed after the deadlines for discovery and dispositive motions had passed).

Moreover, even if Floyd could show he diligently moved to extend the deadline for

filing an amended pleading as soon as he recognized that amendment might be required, amendment would be futile. Floyd's original Complaint was filed on April 7, 2017. As such, the Court has already held that any claims that accrued prior to April 7, 2015, were time-barred by the applicable two-year statute of limitations. Dkt. 27, at 4. The conduct that Floyd seeks to add as the basis of a new claim occurred on December 16, 2014, and is thus time-barred. Dkt. 65, at 5.

Finally, Defendants would be significantly prejudiced by allowing amendment at this late stage of the proceedings. All of the Scheduling Order's deadlines have passed in this case, including the deadline for dispositive motions. Because Floyd seeks to add a new cause of action against a new defendant,[16] all of these deadlines would need to be reset if the Court were to grant Floyd's motion.

After three years of litigation, and more than five years after the conduct alleged in Floyd's proposed Third Amended Complaint occurred, Defendants would be significantly prejudiced if they were forced to essentially begin this case anew. *Roberts v. Arizona Bd. of Regents*, 661 F.2d 796, 798 (9th Cir. 1981) (affirming district court's denial of leave to amend where opposing party would be prejudiced by plaintiff's attempt to add new claim at the eleventh hour, after discovery was virtually complete, and where defendant's motion

---

[16] Floyd's proposed Third Amended Complaint seeks to add a claim against Senderowicz for allegedly retaliating against him for filing three grievances. Prisoners have a First Amendment right to file non-frivolous grievances against prison officials and to be free from retaliation for doing so. *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015). Floyd's original, First Amended, and Second Amended Complaints did not assert any alleged First Amendment violations and are instead each based entirely on Defendants' purported violations of Floyd's Eighth and Fourteenth Amendment rights to adequate medical care. Because Floyd seeks to add an entirely new claim for a different constitutional violation, Senderowicz cannot simply take the place of "Jane Doe 4," and the proposed claim against her represents a new claim.

for summary judgment was already pending before the court). In sum, good cause does not support amendment and Floyd's Motion to Amend (Dkt. 64) is accordingly **DENIED**.

### E. Motion to Stay Summary Judgment (Dkt. 66)

Floyd requests that the Court stay summary judgment because Defendants have failed to produce requested discovery.

#### 1. Legal Standard

Federal Rule of Civil Procedure 56(d) authorizes district courts to defer considering a motion for summary judgment if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition[.]" Fed. R. Civ. Proc. 56(d)(1). The party seeking a Rule 56(d) continuance bears the burden of proffering sufficient "facts to show that the evidence sought exists, and that it would prevent summary judgment." *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (9th Cir. 1996) (considering Rule 56(d)'s predecessor, Rule 56(f)). "Moreover, the district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past." *Conkle v. Jeong*, 73 F.3d 909, 914 (9th Cir. 1995).

#### 2. Analysis

Floyd seeks to stay summary judgment because Defendants purportedly failed to produce four items he requested during discovery: (1) the standards set forth by the National Commission on Correctional Health Care ("NCCHC Standards"); (2) a copy of the medical contract with ACJ Psychiatrist Dr. Scott Eliason; (3) staffing plans created by Kate Pape; and (4) the "JCSB SOP Manual." Dkt. 66, at 1–2.

In response, Defendants note that they have already produced items two and three. Specifically, to comply with Floyd's request for a copy of "the medical contract with the private medical provider in its entirety," Defendants previously produced the contract ACJ had in place with its medical doctor at the time relevant to Floyd's suit, believing this was the "medical contract" Floyd sought. Dkt. 74, at 3. Because Floyd indicated he was instead seeking a copy of the ACJ's contract with its psychiatrist, Defendants later supplemented their discovery response with a copy of Dr. Eliason's contract. *Id*. Defendants also already produced Pape's mental health staffing plans, and such plans are in the record on summary judgment. Dkt. 72-1, at 47–48. Thus, only items one and four remain at issue.

Defendants objected to producing the NCCHC Standards because the ACJ's copies of the NCCHC Standards are copyrighted books, and they could not make and produce copies from such works without violating copyright law. Dkt. 74, at 3. Defendants instead directed Floyd to the website where he could purchase his own copy of the NCCHC Standards. Defendants also informed Floyd that the "JCSB SOP manual" no longer exists because the JCSB has been split into two separate bureaus: the Jail Services Bureau and the Court Services Bureau. *Id*. Defendants believed Floyd sought the Jail Services Procedures. Because the Jail Services Procedures "contain detailed internal procedures for the operation of the Ada County Jail," Defendants objected that disclosure "of these procedures to anyone, especially a current inmate of the Ada County Jail, would constitute a severe threat to the safety and security of the Ada County Jail and the community." *Id*.

For the first time in his Rule 56(d) Motion, Floyd seeks the Court's intervention in obtaining the aforementioned information. Floyd has not provided any explanation, by way

of affidavit or declaration, of how either the NCCHC Standards or the "JCSP SOP manual" are necessary or even relevant to defeat Defendants' Motion for Summary Judgment. Floyd's failure to comply with the requirements of Rule 56(d) alone supports denying his Motion to Stay. *Tatum v. City and Cty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006); *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002) ("Failure to comply with [the requirements of Rule 56(d)] is a proper ground for denying relief.").

Although not in his Motion to Stay, Floyd implies in his third Motion to Appoint Counsel that he did not know how to secure the aforementioned discovery due to his pro se status. Dkt. 68, 1–2. However, pro se litigants are expected to abide by the rules of the court in which they litigate. *Carter v. C.I.R.*, 784 F.2d 1006, 1008 (9th Cir. 1986); *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995) ("[P]ro se litigants are bound by the rules of procedure."). Further, Floyd's belated complaints about Defendants' production are insufficient. Floyd had more than enough time to conduct discovery on his claims; in fact, the Court allowed Floyd a sixty-day extension to the discovery deadline originally imposed in its Scheduling Order.

During the three years this case has been pending, Floyd has never filed a motion to compel discovery. A party may not unduly delay in moving to compel discovery, and untimeliness "is sufficient ground, standing alone, to deny a discovery motion." *KST Data, Inc. v. DXC Tech. Co.*, 344 F. Supp. 3d 1132, 1136 n.1 (C.D. Cal. 2018) (citation omitted). Indeed, courts "will often deny Rule 37(a) motions because the moving party delayed too long." 8B Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, FEDERAL

PRACTICE & PROCEDURE, § 2285 (3d ed. Supp. 2020) (collecting cases); *Rossetto v. Pabst Brewing Co., Inc*., 217 F.3d 539, 542 (7th Cir. 2000) (finding district court did not err in denying a discovery motion filed by plaintiffs two months after the date set by the court for completion of discovery); *Mikeron, Inc. v. Exxon Co., U.S.A*., 264 F. Supp. 2d 268, 274 n.4 (D. Md. 2003) (holding plaintiff who never moved to compel discovery prior to expiration of discovery deadline could not do so for the first time on summary judgment).

The Court rejects Floyd's attempt to compel discovery through Rule 56(d) after both the discovery and dispositive motion deadlines have passed. *Audi AG v. D'Amato*, 469 F.3d 534, 541 (6th Cir. 2006) (affirming district court's rejection of party's Rule 56 motion to stay summary judgment and obtain additional discovery where such motion was filed after the close of discovery). Floyd's Motion to Stay (Dkt. 66) is accordingly **DENIED**.

## F.  Motion to Appoint Counsel (Dkt. 68)

Although the Court has twice denied Floyd's motions to appoint counsel because his requests did not rise to the level of exceptional circumstances (Dkts. 27, 55), Floyd argues exceptional circumstances support his third request for counsel because he needs help accessing the aforementioned discovery. Dkt. 68, at 1–2. However, as mentioned, Floyd does not explain why such discovery is necessary to defeat Defendants' Motion for Summary Judgment, other than by noting Defendants refer to the NCCHC Standards or to the "JCSP SOP manual" at unidentified places in the record. The Court has not considered such references on summary judgment and, for the reasons described above, it is too late for Floyd to compel discovery—even if the Court now appointed him counsel.

Floyd also claims he is at a substantial disadvantage because he has not had adequate

time to prepare his response to Defendants' Motion for Summary Judgment. *Id*. at 2–3. Yet, the events at issue in this case took place over five years ago. Despite this significant passage of time, Floyd (as set forth fully below) has still failed to present evidence to establish a genuine issue of material fact precluding summary judgment on his remaining claims. If Floyd could not gather his own evidence within the last five years—particularly when he was out of custody for a substantial portion of this time—it is unclear how an attorney appointed at this late juncture could do so.

Finally, Floyd alleges that he has had inadequate access to the ACJ's law library and also has limited legal knowledge. As the Court has previously explained, "Floyd's argument that he has limited knowledge of the law and limited access to a law library or other legal materials is not based on the complexity of the legal issues involved in this specific case, but rather on the general difficulty of litigating pro se." Dkt. 55, at 7 (citing *Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986) ("If all that was required to establish successfully the complexity of the relevant issues was a demonstration of the need for development of further facts, practically all cases would involve complex legal issues.")).

In short, Floyd's third request for counsel still fails to rise to the level of exceptional circumstances; his Motion to Appoint Counsel (Dkt. 68) is **DENIED**. **Motion for Summary Judgment (Dkt. 60)**

Defendants seek summary judgment on Floyd's two remaining claims.

*1. Legal Standard*

Summary judgment is proper "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The court's role at summary judgment is not "to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering

a motion for summary judgment, all reasonable inferences must be drawn in the light most

favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,

809 F.2d 626, 631 (9th Cir. 1987).

To defeat a motion for summary judgment, the respondent need only present

evidence upon which "a reasonable juror drawing all inferences in favor of the respondent

could return a verdict in [his or her] favor." *Id*. (citation omitted). However, the respondent

cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary

judgment; rather the respondent must set forth the "specific facts," supported by evidence,

with "reasonable particularity," that precludes summary judgment. *Far Out Productions,*

*Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). If the non-moving party fails to make this

showing, the moving party is entitled to judgment as a matter of law. *Id*. (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

 2. *Analysis*

  a. Evidence Considered

As an initial matter, Floyd did not file any affidavits or declarations to support the

argument or evidence he submitted in response to Defendants' Motion for Summary

Judgment. Conclusory allegations in opposition to summary judgment which are unsworn

and unsupported by affidavits fail to comply with Federal Rule of Civil Procedure 56(e)'s

requirement that a plaintiff set forth "specific facts" precluding summary judgment. *Mitchel v. General Elec. Co*., 689 F.2d 877, 879 (9th Cir. 1982); *British Airways Board v. Boeing Co*., 585 F.2d 946, 951–52 (9th Cir. 1978) ("[L]egal memoranda and oral argument are not evidence, and they cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion where no dispute otherwise exists.").[17]

Although Floyd's conclusory allegations are insufficient to oppose Defendants' Motion for Summary Judgment, much of the evidence upon which he relies has also been submitted by Defendants in admissible format, properly supported by sworn affidavits. Given the Ninth Circuit's long-held policy of ensuring "that pro se litigants do not unwittingly fall victim to procedural requirements that they may, with some assistance from the court, be able to satisfy," the Court considers the merits of Floyd's contentions, where such contentions are supported by admissible evidence. *Waters v. Young*, 100 F.3d 1437, 1441 (9th Cir. 1996).

    b.  <u>Section 1983</u>

Floyd's two surviving claims are brought pursuant to 42 U.S.C. § 1983, the civil rights statute. Section 1983 does not itself create or establish any federally protected rights. Instead, it "merely provides a method for vindicating federal rights elsewhere conferred"—

---

[17] When considering a motion for summary judgment against a pro se plaintiff, "the Court must consider as evidence the pro se party's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where the pro se party attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Kocsis v. Delta Air Lines, Inc*., 963 F. Supp. 2d 1002, 1011 (D. Haw. 2013) (citing *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004)). Floyd has not attested under the penalty of perjury that the contents of his Second Amended Complaint (Dkt. 29), Statement of Disputed Facts (Dkt. 71), or Response to Defendants' Motion for Summary Judgment (Dkt. 72), are true and correct.

such as in the U.S. Constitution. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks and citation omitted). Floyd alleges Defendants' failure to adequately treat his mental health and foot condition violated his constitutional right to receive adequate medical care during incarceration.

Floyd alleges Defendants were deliberately indifferent to his medical needs in violation of the Eighth and Fourteenth Amendments. Deliberate indifference to a serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In the Ninth Circuit, the test for deliberate indifference consists of two parts: the plaintiff must show a "serious medical need," and must also show that the defendant's response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

A "serious medical need" exists if failure to treat the injury or condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." *Id*.  The second prong—that defendant's response to the need was deliberately indifferent—is satisfied by showing: "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need"; and "(b) harm caused by the indifference." *Id*. (citing *Estelle*, 429 U.S. at 104).

Where, as here, the inmate-patient is a pretrial detainee rather than a convicted prisoner, his rights derive from the Fourteenth Amendment's Due Process Clause, rather

than from the Eighth Amendment's Cruel and Unusual Punishments Clause.[18] *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016). For many years, the standards under both the Eighth and Fourteenth Amendments were treated as the same and courts applied a subjective deliberate indifference standard to either claim. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1122–23 (9th Cir. 2018). Under that standard, a defendant was liable only if he "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both [have been] aware of facts from which the inference could be drawn that substantial risk of serious harm exist[ed], and he must also [have drawn] the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

However, the use of a subjective deliberate-indifference standard has recently changed in the Ninth Circuit with respect to pretrial detainees' claims for violations of their right to adequate medical care.[19] *Gordon*, 888 F.3d at 1125.[20] A deliberate indifference test

---

[18] This is because the "language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all[.]" *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466, 2475 (2015).

[19] In its first order granting Defendants' Motion to Dismiss on December 27, 2017, the Court referenced a subjective deliberate indifference standard. Dkt. 27, at 8–9. This decision issued before *Gordon* was decided and, in any event, did not prejudice Floyd because he was given leave to amend all claims that were not time-barred.

[20] In *Kingsley*, the Supreme Court held a pretrial detainee bringing an excessive-force claim did not need to prove that the defendant was subjectively aware that the amount of force was unreasonable, but instead needed only to show that the force was objectively unreasonable. 135 S.Ct. at 2476. In *Gordon*, the Ninth Circuit extended *Kingsley's* objective deliberate indifference standard to inadequate medical care claims brought by pretrial detainees. 888 F.3d at 1122–25. The Seventh Circuit has similarly extended *Kingsley's* objective deliberate indifference standard to a claim brought by a pretrial detainee. *Miranda v. Cty. of Lake*, 900 F.3d 335, 355 (7th Cir. 2018). The Eighth, Eleventh, and Fifth Circuits have chosen to confine *Kingsley* to its facts—that is, to Fourteenth Amendment claims based on excessive-force allegations in a pretrial setting. *See, e.g., Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Dang by & through Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 n. 2 (11th Cir. 2017); *Alderson v. Concordia Parish*

still applies to a pretrial detainee's claim, but it is an objective deliberate indifference test, rather than the subjective deliberate indifference test applicable to a prisoner's claim. *Gordon*, 888 F.3d at 1124–25.

Under *Gordon*, a plaintiff must show: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of defendant's conduct obvious;[21] and (4) by not taking such measures, the defendant caused the plaintiff's injuries. *Gordon*, 888 F.3d at 1125. In addition, a plaintiff must establish that he had a serious medical need. *Narcisse v. Tafesse*, 2019 WL 4417635, at *5 (N.D. Cal. 2019); *Pajas v. Cty. of Monterey*, 2018 WL 5819674, at *4 (N.D. Cal. 2018).

    c.   Mental Health Treatment

        i.   Serious Medical Need

Defendants first argue Floyd's claim of deliberate indifference for failure to treat his mental health should be dismissed because Floyd cannot show he was suffering from mental illness at the time of the alleged constitutional violation. As highlighted in the

---

*Corr. Facility*, 848 F.3d 415, 419 n. 4 (5th Cir. 2017) (following circuit precedent and concluding that the issue was not directly raised).

[21] This is the element of the deliberate indifference test—the requisite state of mind of an individual defendant—that *Gordon* revised with respect to pretrial detainees. While a defendant's conduct must be subjectively unreasonable in cases brought by convicted prisoners alleging inadequate medical care, the defendant's conduct must be objectively unreasonable in cases brought by pretrial detainees. *Id*. at 1125.

factual background section, *supra*, Floyd repeatedly denied having any mental ailments and taking any prescription medications both when he was booked into the ACJ, and when he was subsequently assessed for health issues by Nurse Twohig. Dkt. 62-5, Ex. D; Dkt. 62-5, Ex. C.

On summary judgment, Floyd has not submitted any evidence that he informed any ACJ provider that he suffered from depression and anxiety, between his arrest on August 25, 2014, and health request on November 17, 2014, or that he was bipolar and had been taking Depakote and Seroquel between his arrest and his visit with Senderowicz on December 16, 2014. Instead, Floyd submits records from when he was in the custody of the ACJ in 2012. Dkt. 72-1, at 3–4, 13–15, 24–26. Defendants have also submitted most of Floyd's 2012 medical records. Dkt. 62-5, Ex. C, at 6–9, 28–29.

The 2012 records indicate Floyd reported he was suicidal when he was booked into the ACJ for a different crime on August 15, 2012—two years prior to the facts at issue in this case. At that time, Floyd reported that he had been drinking heavily, using drugs, and was "thinking about killing himself or possibly others." Dkt. 62-5, Ex. C, at 6–7. Such records also note Floyd informed ACH providers that he was taking Seroquel and Trazadone in 2012. *Id*. Given his documented suicidal behavior—both in 2012 and again on August 26, 2014—Floyd argues he has serious mental health issue in 2014.

Defendants suggest the 2012 records are irrelevant, as medical conditions and prescriptions change over time. However, the records submitted by both Floyd and Defendants on summary judgment establish that Floyd was suicidal and suffering from alcohol withdrawal when booked into the ACJ in 2012, and also had symptoms of alcohol

withdrawal, was suicidal, and actually attempted suicide when he was again booked into the ACJ in 2014. Dkt. 72-1, at 13–14; Dkt. 62-5, Ex. C, at 6–11.

On summary judgment, Floyd has established a genuine issue of material fact precluding summary judgment with respect to whether his mental health condition constituted a serious medical need. "A heightened suicide risk or an attempted suicide is a serious medical need." *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *vacated on other grounds in City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011). "It is not necessary that a serious medical need imminently result in death—an attempted suicide is sufficient." *Id*. at 1096 (citing *Doty v. Lassen*, 37 F.3d 540, 546 (9th Cir. 1994)).

The significance of Floyd's suicide threat is disputed and presents a question for the jury. It is true that Floyd underwent several medical evaluations in the days before and after his 2014 suicide attempt, and that he did not identify his mental health issues or that he was allegedly prescribed medication for depression during such evaluations. After he attempted suicide, Floyd was released from suicide watch when he assured social worker Lee Penchansky that he would not hurt himself and after he "adamantly deni[ed] suicidal ideation" to social worker Shanna Pickren. Dkt. 62-5, Ex. C, at 29–30. However, Floyd's documented history of mental health problems, substance abuse, suicide threats, and suicide attempt on August 26, 2014, support the conclusion that the threat to Floyd's health was objectively serious, and that, if untreated, he was likely to suffer further significant injury. *Id.* at 6–11. A reasonable juror could conclude in light of all the circumstances that Floyd's actions evidenced he had a serious medical need.

To survive summary judgment, Floyd must next show that Defendants were

deliberately indifferent to his mental health.[22] *Gordon*, 888 F.3d at 1125.

ii. Deliberate Indifference: Nurses Dean and Woodcook

To state a claim against an individual under § 1983, a plaintiff must allege a violation of rights protected by the United States Constitution or created by federal statute, proximately caused by a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

Floyd has not presented evidence to show that Nurse Dean and Nurse Woodcook were indifferent to his medical needs. Although the Court allowed Floyd to proceed against Nurses Dean and Woodcook at the Motion to Dismiss stage because Floyd alleged they treated him as a "nuisance," never scheduled him to see a social worker, and merely told Floyd he was scheduled to see a social worker "to pacify [him] until he was released from the Ada county jail," the record on summary judgment shows such allegations are false. Dkt. 36, at 7 (quoting Dkt. 29, at 3).

It is now clear that Nurse Dean confirmed Floyd was scheduled to see a social worker on December 14, 2016, and that Nurse Woodcook again confirmed this appointment on December 16, 2014. Dkt. 60-5, at ¶ 2; Dkt. 62-2, Ex. A; Dkt. 60-8, at ¶ 2. Nurse Dean and Nurse Woodcook both signed sworn declarations stating Floyd was seen by Senderowicz on December 16, 2014. Dkt. 60-5, at ¶ 3; Dkt. 60-8, at ¶ 3. Defendants have also submitted the medical record from Floyd's visit with Senderowicz on December

---

[22] There is no cause of action regarding the treatment Floyd received while on suicide watch between August 26-28, 2014, and none of the ACJ individuals involved in Floyd's treatment during that time period are defendants in this case. Floyd's mental health claim is solely against individual defendants Nurse Dean, Nurse Woodcook, and Jane Doe 2, as well as against municipal defendants Ada County and the ACJ.

16, 2014. Dkt. 62-2, Ex. A, at 4. Floyd's subjective complaints at that time were:

> Pt reports [history] of taking Depakote and Seroquel for bipolar disorder, treated through Access Behavioral Health. Pt states he has a [history] of treating his mental health with meth. Pt has multiple complaints about the jail not meeting his medical needs and states part of his depression is [related to] this. Pt presents highly dysphoric. Plan is to obtain pt's [mental health] records before considering referral for [mental health treatment].

*Id*.

Although the medical records show that Senderowicz treated Floyd at 4:44 p.m. on December 16, 2014, and that she thereafter requested his medical records from Access Behavioral Health to confirm his reported prescriptions, Floyd claims he never saw Senderowicz. To support this allegation on summary judgment, Floyd argues no person can be in two places at once, and Senderowicz logged that she requested Floyd's records from Access Behavioral Health at 4:44 that day—the same time she also reported seeing Floyd. Dkt. 71, at 7 (citing Dkt. 62-5, Ex. A and Dkt. 72-1, at 27).

It is unclear whether the duplication in time was a mistake, if it indicates the time Senderowicz logged her notes for requesting Floyd's records and for her appointment with Floyd (rather than the time such events actually occurred), or if it shows Senderowicz did not see Floyd but instead simply requested his medical records. The latter conclusion does not make much sense, as there is no record of Floyd ever telling an ACJ provider that he was taking Depakote and Seroquel, or that he was being treated by Access Behavioral Health, at any time between his arrest on August 25, 2014, and appointment with Senderowicz on December 16, 2014. In the absence of such evidence, it is unclear why Senderowicz would contact Access Behavioral Health out of the blue on December 16, 2014. Nor does Floyd address why Senderowicz would record statements he purportedly

MEMORANDUM DECISION AND ORDER - 36

made (such as stating that part of his depression was related to the jail not meeting his medical needs) during an appointment that allegedly never occurred. Dkt. 62-2, Ex. A, at 4.

Regardless, as Defendants note, whether or not Floyd was actually seen by Senderowicz is irrelevant to his claims against Nurse Dean and Nurse Woodcook because they scheduled him for further treatment with Senderowicz, and both also believed he was in fact seen by Senderowicz.[23] Dkt. 60-5, ¶ 3; Dkt. 60-8, ¶ 2–3. Nurses Dean and Woodcook did not deny, delay, or intentionally interfere with Floyd's medical care, but instead scheduled him for further treatment. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (explaining deliberate indifference may be manifested in two ways, when prison officials deny, delay or intentionally interfere with medical treatment, or by the way in which prison physicians provide medical care). Other than falsely claiming they lied about scheduling him for an appointment with a social worker, Floyd has not identified any way the medical care Nurses Dean and Woodcook provided was deliberately indifferent.[24]

Floyd's claim that Nurse Dean and Nurse Woodcook were deliberately indifferent

---

[23] Senderowicz is not a defendant in this action and, as previously discussed, Floyd's request to amend his complaint for a fourth time to add her as a defendant lacks good cause.

[24] Nurse Dean and Nurse Woodcook also assert they are entitled to qualified immunity. Qualified immunity generally shields "governmental officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Ultimately, if the law is clear, and the individual's behavior was legal, immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It is clear from the record in this case that Nurse Dean and Nurse Woodcook's conduct was lawful and did not violate Floyd's constitutional rights. Accordingly, they are entitled to qualified immunity. This is an additional, independent reason summary judgment should be granted in their favor.

to his mental health accordingly fails as a matter of law. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under Section 1983 arises only upon a showing of personal participation by the defendant[.]"); *Rizzo v. Goode*, 423 U.S. 362, 373 (1976) (claims under § 1983 require an actual connection or link between the actions of defendants and the deprivation alleged to have been suffered by plaintiff).

### iii. Deliberate Indifference: Jane Doe 2

Floyd alleged in his Second Amended Complaint that he told Jane Doe 2 (identified in his proposed Third Amended Complaint as Nurse Twohig)[25] on September 9, 2014, that he had been taking Depakote and Seroquel for over two years for his depression, anxiety, and bipolar disorder, and that she failed to confirm the prescription or otherwise supply Floyd with the prescribed medication. The Court previously held that these facts, if true, would constitute deliberate indifference. Dkt. 36, at 7. On summary judgment, Floyd does not present any evidence to support this allegation, and the medical records in fact refute it.

First, there is no record that Floyd saw Nurse Twohig—or any other provider—on September 9, 2014. Second, the records that do involve Nurse Twohig do not support Floyd's claim that he told her he was prescribed Depakote or Seroquel. Specifically, Nurse Twohig first treated Floyd when he was booked into the ACJ on August 25, 2014. Dkt. 62-5, Ex. C, at 9–10. Floyd advised her that he had been drinking heavily and had recently

---

[25] Defendants argue it is too late for Floyd to amend his complaint to identify "Jane Doe 2" as Nurse Twohig. Although the Court agrees, it nonetheless assumes for purposes of summary judgment that Jane Doe 2 is Nurse Twohig so it can consider whether the evidence against Nurse Twohig is sufficient to establish a disputed material fact with respect to Floyd's claim against "Jane Doe 2."

suffered two seizures but did not inform her that he had depression or anxiety, or that he was prescribed Depakote or Seroquel. *Id*.

On September 2, 2014, Nurse Twohig conducted a health assessment of Floyd, during which he denied taking any prescription medication. Dkt. 62-5, Ex. D, at 33. Floyd also denied suffering from any chronic health conditions except Hepatitis C. *Id*. Nurse Twohig again treated Floyd on September 10, 2014, for lower right abdominal pain. Dkt. 62-5, Ex. C, at 12. Floyd did not complain of any mental health issues during his September 10, 2014 visit. *Id*. The first time Floyd appears to have advised any ACJ provider that he was suffering from depression and anxiety was in his November 17, 2014 health services request.

Further, Floyd has not presented any evidence to show he actually had prescriptions for Depakote or Seroquel when he was booked into the ACJ in 2014. Regardless of Floyd's 2012 medical records, Nurse Twohig cannot be found to have been deliberately indifferent based on a failure to provide Depakote and Seroquel when there is no evidence to show either that Floyd was prescribed Depakote and Seroquel in 2014, or that he informed Nurse Twohig that he was prescribed such medications at that time. Clearly, Nurse Twohig could not disregard an obvious risk of failing to provide medications she had no reason to know Floyd was prescribed. *Gordon*, 888 F.3d at 1124–25 (explaining the objective deliberate indifference standard requires not only that an official's conduct be unreasonable, but also that the "high degree of risk" from that conduct be obvious). Floyd's claim against Jane

Doe 2 accordingly fails as a matter of law.[26]

### iv. Deliberate Indifference: ACJ and Ada County

To state a claim against a government entity under § 1983 (a *Monell* claim), a plaintiff must allege (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounted to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy was the moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal citation omitted). The deliberate indifference standard for municipalities is an objective standard. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016). This standard is satisfied when "a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission [or act] is substantially certain to result in the violation of the constitutional rights of their citizens." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 396 (1989) (brackets added)).

On summary judgment, Floyd fails to meet the first element of a *Monell* claim because he has not shown that any individual state actors were deliberately indifferent to his mental health condition. *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (noting that to impose liability against a county under *Monell*, a plaintiff must show

---

[26] Jane Doe 2 is also entitled to qualified immunity since her conduct did not violate Floyd's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (explaining qualified immunity shields officials from civil liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Harlow*, 457 U.S. at 818).

that a county employee violated the plaintiff's constitutional rights). Because Floyd cannot establish that an ACJ employee was deliberately indifferent to his mental health, his *Monell* claim fails as a matter of law.[27]

### d. Foot Pain

#### i. Serious Medical Need

In his Second Amended Complaint, Floyd describes his foot pain as "neuropathy (nerve Pain)" caused by his "borderline" diabetes, which "left untreated can lead to amputation of the limb." Dkt. 29, at 5. Floyd alleges Defendants were deliberately indifferent to his neuropathy and diabetes by failing to examine his feet, refusing to give him appropriate shoes, and failing to provide him with sufficient access to pain medication.

On summary judgment, Floyd has not presented any evidence that he has ever been diagnosed with diabetes or neuropathy, either prior to his arrest in 2014, or since.[28] Claim Five fails as a matter of law because Floyd has not put forth any evidence to show his foot pain constituted a serious medical need.

---

[27] Further, Floyd has not presented any evidence to support his claim that the ACJ had a custom or policy of "understaff[ing] mental health providers in the jail to deal with the amount of mentally ill inmates in order to save money [b]ecause they believe most inmates will be released soon or transferred out," as he alleged in his Second Amended Complaint (Dkt. 29, at 4), much less that such purported policy was the moving force behind a constitutional violation. *Dougherty*, 654 F.3d at 900. On summary judgment, Claim Three does not meet any of the four elements required for a *Monell* claim. *Id.*

[28] Floyd does submit a form from his January 2019 arrest stating his "current problems" include diabetes. Dkt. 72-1, at 11-12. It is unclear whether Floyd has been formally diagnosed with diabetes since his transfer from the ACJ to IDOC in October, 2015, or simply reported diabetes as a health condition when he was again booked into the ACJ in 2019. Regardless, there is no medical evidence to suggest the ACJ had any reason to suspect Floyd had diabetes either prior to, or during, the time period at issue in this suit.

ii. Deliberate Indifference: Individual Defendants "Jane Doe 3", Nurse Woodcook and Nurse Rankin[29]

Notwithstanding Floyd's failure to establish he has diabetes or neuropathy, there is also no evidence that a reasonable prison official under the circumstances would have known Floyd's foot pain constituted a serious medical need. A constitutional violation may take place when the "government does not respond to the legitimate medical needs of a detainee whom it has reason to believe is diabetic," *Lolli v. Cty. of Orange*, 351 F.3d 410, 420 (9th Cir. 2003). While the Court recognizes diabetes is a serious medical need, here, unlike in *Lolli*, Defendants had no reason to believe Floyd was diabetic.

Specifically, in *Lolli*, a pretrial detainee informed his arresting officer that he was diabetic, felt ill, and needed to eat as soon as possible. *Id*. at 411. After he was taken to jail, Lolli relayed that same information to the screening nurse, who tested his blood sugar, recorded his diabetic status on her chart, and allegedly assured Lolli that he would receive food promptly. *Id*. Lolli was removed to a holding cell and remained there for several hours without food or insulin. *Id*. When guards arrived over four hours later, Lolli told them that he was diabetic, was feeling very sick, and had been promised food that was long overdue. *Id*. at 420. The guards ignored Lolli's requests. The Ninth Circuit determined the officers' "indifference to Lolli's extreme behavior, his obviously sickly appearance, and his explicit

---

[29] "Jane Doe 3" has not been identified, and, in his proposed Third Amended Complaint, Floyd notes "this staff member is still not known to Floyd." Dkt. 65, at 8 n. 3. Regardless, Floyd has not offered any argument as to Jane Doe 3, and his claims against her are appropriately dismissed. Further, while Floyd initially named Nurse Rankin as a defendant, it is clear on summary judgment that his allegations regarding Nurse Rankin instead refer to Pape. Dkt. 60-2, at 7-8; Dkt. 60-7, ¶¶ 2-4. Although it is too late for Floyd to add Pape as a defendant, the Court considers Floyd's allegations regarding Pape to determine whether they are sufficient to establish a disputed material fact with respect to his foot pain claim.

MEMORANDUM DECISION AND ORDER - 42

statement that he needed food because he was a diabetic could easily lead a jury to find that the officers consciously disregarded a serious risk to Lolli's health." *Id*. at 421.

By contrast, here Defendants had no reason to believe Floyd was diabetic. At the time of booking, Floyd informed jail staff that he did not take any prescription medications, that he did not require any special medical equipment, and that he did not take insulin for diabetes. Dkt. 62-5, Ex. D, at 39. As mentioned, during his subsequent health assessment on September 2, 2014, the only chronic medical condition Floyd identified was Hepatitis C. *Id*. at 33. Floyd did not inform any staff member that he had diabetes or that he was "borderline" diabetic. *Id*. Despite over thirty visits to the HSU during his incarceration at the ACJ during the time period at issue, there is not a single reference to diabetes or neuropathy in Floyd's 2014–2015 medical record.[30] Dkt. 62-5, Ex. C, at 9–20, 29–30.

Floyd argues that he had a serious medical need regardless of what caused his foot pain because he was in pain so significant it affected his ability to walk. Dkt. 72, at 8–9. Other than this self-serving allegation, Floyd does not submit any evidence—or even his own affidavit—to support his claim that he had problems walking due to foot pain. Moreover, the medical evidence in the record refutes Floyd's claim that he had trouble walking, as the objective findings in his medical appointments—both before and after his April, 2015 grievance—repeatedly note Floyd had "normal" or "steady" gait, and/or "ambulates w/o assistance" or "ambulates without difficulty." Dkt. 62-5, Ex. C at 10–20. Floyd cannot create a genuine issue of material fact by alleging a factual scenario that is

---

[30] There is also no reference to Floyd having diabetes or neuropathy in any of the records regarding Floyd's 2012 incarceration. Dkt. 62-5, Ex. C, at 6–9, 28–29.

contradicted by the record on summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Nor did the medical requests and grievances that Floyd submitted indicate in any way that any medical condition—much less neuropathy or diabetes—was the cause of his foot pain. Specifically, on April 10, 2015, Floyd submitted a medical request form stating, "My feet *are so sore from wearing these cheap shoes* they hurt to walk." Dkt. 62, Ex. D (emphasis added). Defendants interpreted this request as a request for new shoes rather than an innuendo that Floyd's feet hurt because of a medical condition for which he sought medical evaluation and treatment. Jane Doe 3 responded that the medical department did not provide shoes.

On April 12, 2015, Floyd submitted a more detailed request stating: "I put a Kite in saying that *these cheap shoes hurt my feet*. I am in your custody and unable to get my own. . . . I am 52 years old my feet need support and I hurt." Dkt. 62, Ex. E (emphasis added). Floyd again suggested he was seeking different shoes, not a medical appointment. *Id*.

On April 13, 2015, Floyd filed a medical grievance confirming that April 10 and April 12, 2015 health services requests ("kites") were requests for different shoes. Dkt. 62-5, Ex. B (stating, "I placed 2 kites *requesting different shoes* because my feet hurt so bad even the tops hurt") (emphasis added). In addition, for the first time, Floyd implied that he would like to be seen for evaluation for a medical diagnosis. *Id*. ("No one looked at me or examined me, to make a medical diagnosis . . . . Considering how [it is] [causing] me pain

and affecting my ability to walk daily would indicate something needs to be done."). In response, Nurse Woodcook informed Floyd that the medical department did not prescribe orthotic shoes and that he did not qualify to receive inmate worker shoes. Nurse Woodcook based the latter conclusion on her review of Floyd's medical records, which did not identify diabetes, neuropathy, or other medical condition which would qualify Floyd to receive inmate worker shoes. Dkt. 60-8, ¶ 8.

Although, as Floyd points out (Dkt. 71, at 13), Nurse Woodcook did not examine his feet, she advised Floyd he could set up an appointment with a medical provider to discuss pain management options. Dkt. 62-5, Ex. B. Rather than simply scheduling an appointment, Floyd appealed Nurse Woodcook's response. *Id*. Pape reviewed Floyd's grievance, and again stated he could have an appointment with a medical provider. *Id*. Floyd never requested the appointment or complained of foot pain (or neuropathy or diabetes) at any of his fifteen subsequent medical appointments for other health concerns. Dkt. 62-5, Ex. C, at 14–20.

On summary judgment, Floyd argues Defendants were required to evaluate him for his foot pain under their own policy. Dkt. 71, at 13. Specifically, the ACJ's Policy J-E-07 for Non-Emergency Health Care Requests and Services provides non-emergency health care request forms will be reviewed within 24 hours, and, "if a clinical symptom is described in the request, the inmate will be seen by a qualified health professional within 24 hours (72 hours on weekends)." Dkt. 72-1, at 9.

Floyd suggests his April 10, 2015 and April 12, 2015, kites described a "clinical symptom" because he stated his feet were "sore" and "hurt." Dkt. 71, at 13. However, in

both of these health requests, Floyd specifically stated that his feet were "sore" or "hurt" because of "these cheap shoes." Dkt. 62, Ex. D, Ex. E. An entirely healthy individual could suffer pain from wearing cheap shoes. As such, pain related to wearing cheap shoes does not describe a "clinical symptom" requiring medical evaluation. The Court cannot find Woodcook and Pape violated a purported ACJ policy by failing to schedule a medical evaluation for foot pain that Floyd repeatedly described as pain caused by cheap shoes.

Floyd also argues Nurse Woodcook and Pape should have just scheduled him for a medical evaluation, rather than asking him to confirm that he wanted a medical evaluation. Dkt. 71, at 13–15. Floyd states his kites were in and of themselves requests for appointments because the form states "requesting medical service indicates you are willing to be treated and pay all co-pays associated with the service." *Id*.; *see also* Dkt. 62, at Ex. D, Ex. E.

Even if Nurse Woodcook or Pape should have scheduled Floyd for an appointment rather than attempting to confirm that he wanted a medical evaluation, this does not amount to deliberate indifference. Although *Gordon* revised the test for claims of deliberate indifference to a pretrial detainee's medical needs, it did not completely abandon the deliberate indifference framework applied under typical Eighth Amendment jurisprudence. *Khademi v. Nielson*, 2019 WL 358519, at *4 (E.D. Cal. 2019). A showing of deliberate indifference still requires more than mere negligence, and inadvertent misdiagnosis or medical malpractice does not amount to deliberate indifference. *Gordon*, 888 F.3d at 1125 (noting the mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment). "[T]he plaintiff must 'prove more

than negligence but less than subjective intent—something akin to reckless disregard.'" *Id*. (quoting *Castro*, 833 F.3d at 1071).

Nurse Woodcook and Pape's attempts to confirm whether Floyd was seeking a medical evaluation suggests a miscommunication, which falls short of even negligence. Floyd could have confirmed that he wanted a medical evaluation but chose not to.[31] Dkt. 60-8, ¶ 12. In fact, Floyd was seen by a medical provider for chest pain nine days after Pape denied his appeal but made no mention of his foot pain. Dkt. 62-5, Ex. C, at 14. Further, even if Nurse Woodcook or Pape should have instead scheduled Floyd for an examination, or provided him with orthotic shoes, such failure does not amount to a reckless disregard of Floyd's foot pain, particularly when Woodcook and Pape had no objective basis for knowing that Floyd suffered from a medical condition (such as diabetes and/or neuropathy) that caused such pain.

Because Floyd has not set forth any evidence to establish either that he suffered from a serious medical need or that any of the individual defendants were deliberately indifferent to such need,[32] his foot pain claim fails as a matter of law against all Defendants.

---

[31] Floyd previously argued he did not request a pain management appointment as Woodcook advised him because submitting an inmate request form ("IRF") would have constituted "an abuse of the IRF system," subjecting him to disciplinary action. Dkt. 34, at 6. The Court accepted this allegation as true at the Motion to Dismiss stage. Dkt. 36, at 12. On summary judgment, Nurse Woodcook clarified that Floyd would not have been subject to disciplinary action for filing an IRF, and Floyd has not offered any evidence to the contrary. Dkt. 60-8, ¶ 12.

[32] Jane Doe 3, Nurse Woodcook, and Nurse Rankin are accordingly entitled to qualified immunity with respect to Floyd's foot pain claim. *See*, *supra*, note 24.

*Long*, 442 F.3d at 1186. [33]

    e. *Pain Medication*

       i.  Deliberate Indifference: Individual Defendants Nurse Woodcook, Nurse Rankin, and Farwell

Finally, Floyd alleges Defendants were deliberately indifferent to his need for pain medication because he did not have access to ibuprofen 24 hours a day. As an initial matter, Floyd's pain medication claim fails as a matter of law because, as discussed above, he has not established his foot pain constituted a serious medical need.[34]

Further, Floyd's pain medication claim is against individual defendants Nurse Woodcook, Nurse Rankin, and ACJ Deputy Sheriff Sean Farwell. Dkt. 36, at 18. However, Floyd has not alleged Woodcook, Nurse Rankin, or Farwell, ever personally denied him access to ibuprofen. Nurse Woodcook, Nurse Rankin, and Farwell also filed declarations confirming they did not restrict Floyd's access to ibuprofen at any time. Dkt. 60-7, ¶ 5; Dkt. 60-8, ¶ 14; Dkt. 60-9, ¶ 9. Because Floyd has not identified how such individual

---

[33] In addition, Floyd's foot pain claim also fails as a *Monell* claim because there is no evidence to suggest the purported failure to treat his foot pain was based upon any custom or policy. *Dougherty*, 654 F.3d at 900. Floyd argues failure to follow one's own written policy can be a custom. Dkt. 72, at 5 (citing *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1445 (9th Cir. 1991)). Floyd suggests Defendants' failure to provide him with orthotic shoes was a violation of the ACJ's written policy because the ACJ did have a policy "for the issuing of shoes to diabetic[s] to deal with the neuropathy foot pain." Dkt. 29, at 6. However, because Floyd has not presented any evidence to establish the ACJ had any objective basis to know he was diabetic during the time period at issue in this suit, the ACJ did not violate its policy of distributing shoes to diabetics by failing to give them to Floyd.

[34] As noted, *supra*, note 15, Floyd alleges the ibuprofen he was prescribed for his back pain was insufficient to treat his foot pain. Because he has not presented evidence to suggest his foot pain constituted a serious medical need, Floyd similarly fails to establish Defendants were deliberately indifferent by allegedly failing to provide him with adequate access to ibuprofen for his foot pain.

defendants were allegedly deliberately indifferent to his purported serious medical need, his pain medication claim fails against Nurse Woodcook, Nurse Rankin and Farwell.[35] *Taylor*, 880 F.2d at 1045.

ii.  Deliberate Indifference: ACJ and Ada County

Notwithstanding his failure to allege personal participation by Nurse Woodcook, Nurse Rankin and Farwell, Floyd alleges that his insufficient access to ibuprofen was caused by an unconstitutional custom or policy of the ACJ. Specifically, the ACJ policy regarding KOP medications provides:

> Inmates who are prescribed medication from the KOP list will be issued a locker by the housing deputy and provided the combination to the lock. Inmates will keep medications in their assigned locker at all times. Inmates are responsible for taking the medication in accordance with prescriber instructions. Inmates are required to take medications at the locker. Any loose medication in possession of any inmate away from the locker is a violation of ACJ rules. The only items allowed in the locker are medications issued by HSU staff. Anything else is contraband and will be destroyed.

Dkt. 60-3, Ex. F.

Floyd was prescribed "600 mg BID prn," which means Floyd could take one 600 mg tablet of ibuprofen two times per day as needed. Dkt. 60-4, ¶ 2. Floyd's prescription did not state that Floyd should be allowed to keep the ibuprofen in his cell or on his person. *Id*. at ¶ 3; Dkt. 62-1, Ex. A. Prescription strength ibuprofen is a medication included in the ACJ's KOP list. Dkt. 60-3, ¶ 15.

---

[35] Since Floyd has not offered any evidence to establish Nurse Woodcook, Nurse Rankin, and Farwell were deliberately indifferent to his need for pain medication, they are also entitled to qualified immunity because their conduct—viewed in the light most favorable to Floyd—did not violate a constitutional right. *Saucier*, 533 U.S. at 236.

Given the KOP policy, Floyd could only take ibuprofen when he had access to his locker. On summary judgment, Defendants note that although, per his prescription, Floyd could take ibuprofen twice a day, he had access to his locker at least four separate times a day: at breakfast, lunch, dinner, and at 2200 hours. Dkt. 60-9, ¶ 4; Dkt. 75-1, ¶ 3.[36] As such, Defendants did not ignore the instructions of Floyd's treating physician. *Compare Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) (holding a "prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician") *with Ellis v. Benedetti*, 2012 WL 786258 at *7 (D. Nev. 2012) (finding a difference in opinion with respect to the manner a prisoner is given his prescribed medication is not constitutionally actionable). The KOP policy did not impinge Floyd's constitutional rights because he had access to ibuprofen four times a day, while he was only prescribed up to two ibuprofen per day.

Further, even when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is related to legitimate penological interests. *Turner v. Safely*, 482 U.S. 78, 89 (1987) (finding there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it).

---

[36] On summary judgment, Floyd claims he could not access his locker at mealtimes because the KOP instruction on inmates' lockers states KOP medications cannot be taken at mealtimes. Dkt. 71, at 3 (citing Dkt. 72-1, at 49). The referenced KOP instruction states, "KOP medications shall be taken when the main dorm lights are on. You may **NOT** take your KOP medications during mealtimes, staff shift change, or when staff is conducting other business that does not allow them to observe inmates taking medications." Dkt. 72-1, at 49 (emphasis in original). In support of Defendants' Reply, Farwell filed a supplemental declaration clarifying that while inmates were not allowed to access KOP lockers while food was being distributed, "once that was complete and the deputies could supervise the inmates, they could access the KOP lockers." Dkt. 75-1. Inmates thus had access to their lockers at least four times a day. Dkt. 60-9, ¶ 4; Dkt. 75-1, ¶ 3.

MEMORANDUM DECISION AND ORDER - 50

Defendants suggest the KOP policy was reasonably related to legitimate penological interests because the ACJ has a valid interest in preventing inmates from selling, trading, or bartering prescription medications. Defendants contend that by requiring inmates to keep prescription medications in a locker so they could be taken only when inmates were supervised, the ACJ furthered this interest.

Floyd suggests there was not a valid rational connection between the KOP policy and preventing inmates from selling, trading, or bartering prescription medications because non-indigent inmates could purchase ibuprofen from commissary and have access to it 24-hours a day. Dkt. 71, at 3. Floyd suggests non-indigent defendants could thus sell, trade or barter ibuprofen, while indigent inmates like himself were dependent on Defendants to provide ibuprofen. However, Defendants clarify that while non-prescription strength ibuprofen is available for purchase from the commissary, prescription strength ibuprofen is not. Dkt. 60-3, ¶ 15. Floyd was prescribed prescription strength 600 mg ibuprofen, which could not be purchased from commissary by any inmate or kept in individual cells. *Id*.

The ACJ must follow pharmacy laws that require prescription strength medications to be treated differently from over-the-counter (OTC) medications. Dkt. 62-3, Ex. A, at 5. While OTC ibuprofen is stocked on shelves open to the public, prescription strength ibuprofen has potential serious side effects, requires a prescription, and is kept in a secure location behind the pharmacy counter along with the other prescription drugs. *Id*. "Like a pharmacy, the Ada County Jail keeps prescription strength ibuprofen in a secure location (lockers) and controls access to those prescriptions. Inmates are not allowed to keep prescription strength ibuprofen (or any other prescription medication) in their personal

property in their cell due to the dangers of prescription medications being stolen, abused or bartered." *Id.* Because the ACJ had a legitimate interest in keeping prescription medication out of the hands of inmates who do not have a prescription for it—just as prescription and non-prescription medications are treated differently outside of prison— the KOP policy was valid. *Turner*, 482 U.S. at 89.[37]

In sum, the ACJ and Ada County did not have an unconstitutional policy and, even if the KOP policy did infringe Floyd's constitutional rights, it was related to a legitimate penological interest and was thus valid. Floyd's *Monell* claim regarding his access to pain medication is appropriately dismissed.

## IV.   ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED:

1. Floyd's Motion for Extension of Time (Dkt. 58) is **MOOT** and therefore **DENIED**;

2. Defendants' Motion for Leave to File Overlength Brief (Dkt. 59) is **GRANTED**;

3. Defendants' Motion for Summary Judgment (Dkt. 60) is **GRANTED** in its entirety against all Defendants;

4. Defendants' Motion to Seal (Dkt. 61) is **GRANTED**;

5. Floyd's Motion to File an Amended Pleading (Dkt. 64) is **DENIED**;

6. Floyd's Motion to Stay Summary Judgment (Dkt. 66) is **DENIED**;

---

[37] Further, Floyd could not sell or trade his ibuprofen after he obtained it from his locker (as he contends on summary judgment) because inmates were required to take KOP medication immediately at their lockers and storing or hoarding medications would result in disciplinary action. Dkt. 60-3, Ex. F.

7.  Floyd's Motion to Withdraw Motion for Extension of Time (Dkt. 67) is
    **GRANTED**;

8.  Floyd's Motion to Appoint Counsel (Dkt. 68) is **DENIED**;

9.  Floyd's Motion to File Overlength Disputed Facts (Dkt. 70) is **GRANTED**;

10.  The Court will enter a separate Judgment in accordance with Fed. R. Civ. P. 58.

DATED: April 27, 2020

David C. Nye
Chief U.S. District Court Judge